UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

KIM COUGHLIN,  MARIE ZWEIG, ANNE
GALLAGHER, DONNA NOYCE, TAYLER
THOMPSON  and NYS COURT EMPLOYEES
AGAINST MANDATES LTD

        Plaintiffs,

        -against-

NEW YORK STATE UNIFIED COURT SYSTEM,
NEW YORK STATE OFFICE OF COURT
ADMINISTRATION, CHIEF JUDGE JANET
DIFIORE *in her official administrative capacity as
Chief Judge,* CHIEF ADMINISTRATIVE JUDGE
LAWRENCE K. MARKS, *in his official capacity,*
JUSTIN BARRY *in his official capacity as Chief of
Administration,* NANCY BARRY *in her official
capacity as Chief of Operations*, CAROLYN
GRIMALDI, *in her official capacity as Director of
Human Resources.*

        Defendants

-------------------------------------------------------------------X

**COMPLAINT**

Case no.__**2:22-cv-04002**

Jury Trial:  ☒Yes      ☐No

## PRELIMINARY STATEMENT

1.     Plaintiffs are the backbone of New York State's court system. They are the
       gatekeepers to court operations across the State. Without them, the courts would
       not be able to function. Justice would be illusory, and the citizenry would have
       no forum to civilly resolve disputes.

2.     Plaintiffs are more than their  official titles. They are people just like everyone
       else. They are Americans. When they leave the courthouse, they join the rest of
       the citizenry, commuting home during rush hour.

3.     This action does not involve the COVID-19 pandemic. The events of 2020 are not
       being challenged and are not relevant to Plaintiffs' claims. Rather, this action
       begins, where the pandemic ended; the summer of 2021. When the isolation and
       quarantine measures had dissipated.

4.     The Unified Court System is far from unified. Rules, procedures, and practice
       vary significantly depending on the court and county.

5.     Defendants' have either ended, destroyed, or ruined every single Plaintiffs'
       career, in the pursuit of an endeavor that it lacks the power to pursue, and the
       ability to implement. The very institution society relies on for impartial justice,
       issued a vaccine mandate (Mandate) that was bereft of fairness, equality, logic,
       common sense, clarity, and scientific and lawful authority.

6.     Plaintiffs' bring this action seeking relief set forth, *inter alia*, for the harms they
       suffered at the whims of executive administrators representing New York State's
       Judicial Branch.

7.    No court has dealt with the combination of facts and legal claims asserted here. Defendants can cite as many cases as they want; none of them are authoritative or dispositive. They are all distinguishable. There is no well settled precedent. This is not another lawsuit, amongst the many that have been previously rejected. Defendants' narrative is not the controlling one, and the issues presented herein are novel. This case presents genuine issues of fact, which are disputed.

## PARTIES

8.    Plaintiffs are court officers, stenographers, clerks, assistants, interpreters, judges' administrative assistants, court attorneys,  management analysists, and administrators (collectively OCA Employees or UCS Employees). They work, or have worked, in state courts spanning the entire State of New York.

9.    Plaintiff Kim Coughlin was employed as a court officer in Nassau County Supreme Court.

10.   Plaintiff Marie Zweig Esq. was employed as a law clerk with the Appellate Division of the Supreme Court, Second Department, located in Kings County New York.

11.   Plaintiff Anne Gallagher was employed as a court assistant in County Court, Nassau County.

12.   Plaintiff Donna Noyce worked as a court assistant in Suffolk County Supreme Court

13.   Plaintiff Tayler Thompson was employed as a court officer in Suffolk County.

14.    Plaintiffs consist of ninety-seven (97) OCA Employees.

15.    Plaintiff NYS Court Employees Against Mandates LTD is a not-for-profit corporation organized under the laws of the State of New York—pending final approval by the State—that represents ninety-one (91) of the Plaintiffs and has retained the Law Office of Chad J. LaVeglia PLLC to commence litigation on their behalf.

16.    Plaintiffs comprise groups of individuals who are:

     i.    Terminated.

     ii.    Retired with decreased benefits.

     iii.    Employed with religious exemptions.

     iv.    Employed because they involuntarily got vaccinated.

     v.    On approved leave but their religious exemptions were denied.

17.    Defendant Unified Court System (UCS) is the Judicial Branch of New York State pursuant to article VI of the State's Constitution. Its principal place of business is 25 Beaver Street, first floor, New York, New York, 10004.

18.    Defendant Office of Court Administration (OCA) is the administrative arm of the UCS, with its principal place of business located at 25 Beaver Street, room 852, New York, New York, 10004.

19.    Defendant Chief Judge Janet DiFiore is the Chief Judicial Officer of New York State and oversees establishing statewide administrative policies over court operations and the OCA.

20.     Defendant Chief Administrative Judge Lawrence Marks (Judge Marks) is
        responsible for overseeing and implementing statewide administrative policies
        over court operations. Judge Marks reports to Chief Judge DiFiore and is the
        second highest ranking judicial administrative official.

21.     Defendant Justin Barry is the Chief Administrator for the OCA located at 25
        Beaver Street, room 852, New York, New York, 10004.

22.     Defendant Nancy Barry is the OCA's Chief of Operations for the OCA located at
        25 Beaver Street, room 852, New York, New York, 10004.

23.     Defendant Carolyn Grimaldi is the director of Human Resources for the OCA
        located at 25 Beaver Street, room 852, New York, New York, 10004. Defendant
        Grimaldi is responsible for hiring and terminating OCA employees

## JURISDICTION

24.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331. This Court has
        supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

## VENUE

25.     The United States District Court for the Eastern District of New York  is the
        proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial
        district in which Defendants deprived Plaintiffs of their rights under the
        Constitution of the United States and it is where a substantial part of the events
        giving rise to Plaintiffs' claims occurred, and continue to occur.

## STATEMENT OF FACTS

26.     The judiciary is one of three branches of New York State government.

27. Every state in the union has police powers pursuant to the Tenth Amendment of the United States Constitution.

28. As the nonpolitical branch of government, the New York State Judicial Branch does not have police power.

29. New York State's Judicial Branch is not the State.

30. Pursuant to Article VI of the New York State Constitution The New York State judiciary is established under a unified court system (UCS).

31. N.Y. Const. art VI §28 establishes an administrative board of the courts which consists of the chief judge of the court of appeals and the presiding justices from the appellate division of the supreme court of each judicial department.

32. The New York State Office of Court Administration (OCA) is the administrative arm of the Judicial Branch.

33. The OCA promulgates rules and policies regarding the operations of the courts within the UCS.

34. The core mission of the UCS is to promote the rule of law and to serve the public by providing just and timely resolution of matters before the courts.

35. The OCA creates policies that implement the daily operations of the court system.

36. The OCA and UCS are not public health agencies.

37. The core mission of the UCS is unrelated to public health and safety.

38. The OCA is not responsible for protecting participants in the court system from pathogens that spread from person to person.

39.    None of the defendants are medical doctors, virologists, or health experts.

40.    On or about March 2020, the COVID-19 pandemic began.

41.    Plaintiffs' worked for the OCA when the first case of COVID-19 was reported in 2020.

42.    Plaintiffs kept the Judicial Branch from collapsing during the worst of the pandemic.

43.    Plaintiffs dutifully worked for Defendants regardless of their own health and safety.

44.    By the summer of 2021 however, the deadly strain had been virtually eliminated. The pandemic had ended.

45.    New York State ended its state declaration of emergency regarding COVID-19 in June 2021. The previous governor declared that the State was ready to move forward for a post-COVID New York.

46.    Around the winter of 2021, three COVID-19 vaccinations—made by Pfizer-BioNTech, Moderna, and Johnson & Johnson (collectively Vaccinations or Vaccines or COVID Vaccines—became available to the public[1].

47.    COVID Vaccines were developed to combat the original viral strain sars-cov-2 (Virus).

48.    It has mutated at east fourteen (14) times since then.

---

[1] Johnson & Johnson is not an mRNA vaccine, but it is not mentioned or considered beyond here since it is not recommended by health "experts" and Defendants based its decision to mandate vaccinations upon the approval of the Pfizer-BioNTech vaccine.

COVID VACCINES MANIPULATE HUMAN CELLS TO BUILD SPIKE PROTEINS

49.     COVID Vaccines are not like traditional vaccines.

50.      Traditional vaccines—like the polio vaccine—produce a natural immune response in human beings, by injecting them with a dead, weakened, or inactivated strain of a virus.

51.      COVID Vaccines, however, build an immune response through messenger RNA (mRNA).

52.      mRNA is genetic material that is made from a DNA template during the process of transcription.

53.     mRNA carries information from the DNA in a cell's nucleus to a protein building ribosome.

54.     There, the ribosome reads the mRNA sequence and builds amino acids into proteins.

55.     In regular terms, ribosomes build the stuff we are made of.

56.     These same cells build the proteins that make up the building blocks of life. Accounting for the color of our hair, skin, eyes, and much more.

57.      DNA code cannot be read by the cells that build the proteins responsible for most of humans' necessary bodily functions. mRNA acts as the translator between DNA and protein building cells.

58.      mRNA decodes DNA into instructions—like a blueprint—that the cells responsible for assembling amino acids into proteins can read.

59.   COVID Vaccinations utilize mRNA to instruct the ribosome cells to build a copy of the spike proteins found on the surface of the original virus that causes COVID-19. Then, the body's cells recognize it; triggering an immune response.

60.   COVID-19 Vaccines alter its recipients cellular biology because it manipulates ribosomes to produce spike proteins which in turn are released, and trigger an immune response.

61.   At some point in May 2021, court staff returned to work in person.

62.    Plaintiffs helped the crippled UCS attempt to return to pre-pandemic operations.

## VARIANTS

63.    During the summer of 2021, the Virus mutated.

64.    This mutation was called the Delta variant (Delta).

65.    Delta was the fourth variant of the virus. It was preceded, respectively, by the Alpha, Beta, and Gamma variants.

66.    COVID Vaccines effectiveness against Delta was not known.

67.    Some people infected by the Delta variant, did not exhibit any symptoms.

68.    Other people experienced flu-like symptoms. And a very small proportion of the population died.

69.    An extremely small percentage of the State's population comprised a large percentage of the people who died from Delta, and required hospitalization.

70.    The Delta strain was significantly weaker than the original viral strain.

71.    Plaintiffs' still worked through the summer of 2021.

72.   During the summer of 2021, the State did not require vaccinated people to wear masks in public places.

73.   Defendants still required everyone else entering court facilities to wear masks during the summer of 2021.

74.   State and local public health measures were not applicable to courthouses operated by the OCA.

75.    Around September of 2021—after the Virus had mutated fourteen times—the Omicron variant emerged.

76.    Each variant was significantly weaker than its predecessors.

77.    Subsequent variants caused low to moderate flu-like symptoms, in some individuals, while others presented no symptoms.

78.    COVID Vaccines neither stop the prevention, nor the spread of the variant strains; particularly Omicron.

SIDE EFFECTS AND VARIANT FUTILITY

79.   Few, if any, medical interventions are safe for everyone. Common over the counter medicines are not safe for everyone.

80.    COVID Vaccines are not safe for everyone.

81.    COVID Vaccines do not prevent the transmission or infection of the variants that emerged when Mandate was issued.

82.   As of June 29, 2022, Sean Marrett—BioNTech's Chief business and commercial officer—announced that BioNTech was working on approval for "Omicron adapted COVID-19 vaccines."

83.   COVID Vaccines are only authorized under emergency use authorization.

84.    In some individuals, Vaccines caused adverse side effects such as death, paralysis, and cognitive impairments.

85.    Other side effects included myocarditis, pericarditis, bels palsy, blood clotting and dyskinesia.

TESTING POLICY

86.   On or about August 9, 2021, Chief Judge DiFiore (Chief Judge)  announced that—beginning on September 7, 2021—unvaccinated court staff were going to be required to undergo weekly COVID-19 testing and daily COVID-19 assessments.

87.   Defendants required testing irrespective of whether Plaintiffs appeared sick, reported flu-like symptoms, or had a fever.

88.    Plaintiff's complied with the testing requirements.

89.    Defendants did not institute measures to keep the information from the test results private.

90.    To the contrary, Plaintiffs' health information was available to OCA staff that worked with Plaintiffs in a supervisory capacity.

91.   OCA supervisors and administrators were therefore privy to whether the plaintiffs body contained a viral pathogen.

ORANGE CARDS

92.   Beginning on or about August 18, 2021, Defendants permitted vaccinated employees to attach an orange card to their body, containing their date of

vaccination. Employees with orange cards were not required to wear masks or test.

93.   After about two weeks, Defendants eliminated the orange card policy and required everyone to wear masks.

VACCINE MANDATE AND POLICIES

94.   On or about August 25, 2021, Chief Judge DiFiore, and Chief Administrative Judge Lawrence Marks, via email, announced its mandatory vaccination requirement (Mandate or Vaccine Mandate). The Mandate required all judicial and non-judicial personnel[2]—across the entire state—to be vaccinated, beginning September 27, 2021.

95.   The Mandate was implemented on August 25, 2021.

96.   Defendants stated that it would not require Vaccinations until the FDA approved the Pfizer-BioNTech vaccine.

97.   Defendants stated that the Pfizer-BioNTech vaccine was approved on, or about the same date.

98.   Defendants made up the Vaccine Mandate policy.

99.   Per the Mandate, any employee—without a medical or religious exemption—not vaccinated by September 27, 2021—was prohibited from reporting to work. They also faced disciplinary action, including lost wages, lost benefits, suspension, or termination.

---

[2] The term employee as used herein means both judicial and non-judicial staff.

100. Employees whose religious exemptions were granted must re-apply around September 2022, and then on an annual basis

101. Defendants forced Plaintiffs to make a Hobson's choice: either get injected with genetic material that can cause severe side effects  or end their careers.

102. Per the Mandate, Vaccinated employees lose their vaccinated status after a year.

103. After a year, vaccinated employees are considered unvaccinated.

104. Defendants' require a booster shot for these employee's vaccination status to be considered valid.

105. Upon information and belief, Defendants' are not enforcing this aspect of the Mandate insofar as employees with expired vaccination status are still fully employed.

106. Members of the public—including attorneys, jurors, litigants, police officers, witnesses etc.,—may enter any courthouse in the State regardless of vaccination status.

107. The Mandate does not stop infected members of the public from occupying both public and private areas of the courts.

108. The Mandate does not prevent unvaccinated members of the public from entering courts.

109.  Jurors may access private areas of the court.

110. Defendants' Mandate prohibits Plaintiffs' from entering the courts based on their status as employees.

111.   Attorneys may access restricted areas of courts where incarcerated clients are held.

112.   Criminal defendants appearing for court are kept in restricted areas of courts.

### DEFENDANTS HAVE NOT ASSERTED A BASIS OF POWER

113.   Defendants have no authority, or power to mandate Vaccines.

114.   The Mandate exceeds the scope of Defendants' power.

115.   Neither Congress nor the State Legislature has enacted legislation enabling Defendants to career-ending mandates that are unrelated to court administration.

116.   Neither the United States nor the New York State Constitutions grant such authority to Defendants.

117.   The Defendants gave themselves the authority.

118.   There is no statewide vaccine mandate.

### COURTHOUSES ARE  PUBLIC PLACES

119.   Courts are public places.

120.   The danger of contracting COVID-19 in courts is no different than other public places where people gather.

121.   Courts enforce social distancing, take temperature checks, and stagger calendars.

122.   Court officers can at least enforce social distancing in courts.

123.   In other public places, there are no social distance requirements.

124.   People are in closer proximity to each other.

125. There are no mask requirements and people's vaccination status is unknown.

126.  Occupants in public courthouses are equally—perhaps even less—susceptible to contracting the COVID-19 as in other public places.

127. Plaintiffs—like anyone else—can go to any public establishment irrespective of vaccination status.

128. The volume of people in courts, varies, depending on numerous factors including geography.

COVID VACCINES ARE PERMANENT

129. COVID Vaccinations cannot be undone.

130. Plaintiffs cannot undo the Vaccination at the end of the workday.

131. Defendants' Mandate required Plaintiffs to get a permanent shot simply based on their employment status.

CONTRACT

132. Plaintiffs had binding employment contracts with Defendant UCS (Contract).

133. The entire agreements were contained in the Contract.

134. There is no clause requiring that Plaintiffs get any type of vaccination.

135. Plaintiffs never agreed to get vaccinated as a condition of employment.

136. A vaccination requirement was not a bargained for term of the Contract.

137. The Contract does not provide Defendant UCS with an option to impose said Mandate.

138. Defendant UCS and Defendants, as its agents, unilaterally imposed the Mandate.

139.   The collective bargaining agreements for all other Plaintiffs contain similar wording.

140.   For instance, in Plaintiff Court Officers contract, Article 31 specifically provides that "[w]here the Rules of the Chief Judge and Chief Administrative Judge conflict with the Agreement, the provisions of this Agreement shall prevail."

141.   The Mandate conflicts with said Contract.

142.   For Plaintiff Court Officers Article 32 states—in relevant part—that "[d]uring the term of this Agreement, neither party will unilaterally seek to modify its terms through legislation or any other means."

143.   Plaintiffs relied on the Contract's terms.

144.   UCS could not discipline Plaintiff Court Officers except for incompetency or misconduct proven after a hearing upon stated charges and the procedural rights held by Plaintiffs.

145.   Defendant UCS disciplined said Plaintiffs without providing written charges, a hearing, or any of the due process covenants contained in the Contract.

146.   For Plaintiff Court Officers their Contract was signed by both parties on December 6, 2017. The term of the contract was from April 1, 2011, to March 31, 2021.

147.   It is common practice and industry standard that when a collectively bargained for contract expires, its terms remain in force until both parties reach a new agreement.

## THE RELIGIOUS EXEMPTION PROCESS

148.   Defendants created a Vaccination Exemption Review Committee (Committee).

149.   The vast majority of Plaintiffs applied for religious exemptions.

150.   The vast majority of Plaintiffs' request for religious exemptions were denied.

151.   Defendants did not provide Plaintiffs with any explanation as to why.

152.   When Plaintiffs inquired about the Procees Defendant Grimaldi replied in sum and substance "there is no appeal and there is no internal/administrative mechanism under which an employee may seek review, reconsideration or otherwise appeal the determination of the Exemption Committee"

153.   Plaintiffs who lodged complaints with Defendant Grimaldi passed them off to other departments or agencies.

154.   Defendants did not allow their decision to be reviewed or appealed.

155.   The Committee was tasked with reviewing requests for religious and medical exemptions.

156.   In addition to the Committee, Defendants utilized two in-house UCS attorneys to supervise the Committee.

157.   Defendants' were able to fully accommodate Plaintiffs whose requests were pending by offering testing or the option to work remotely.

158.   Upon information and belief, the Committee members were neither qualified nor properly trained to evaluate whether an applicants' religious beliefs were sincerely held.

159. Upon information and belief, the defendants created the exemption process (Process) with the intent of granting a finite percentage of requests irrespective of validity.

160. The Process permits Defendants' to arbitrarily deny religious exemptions upon resubmission.

161. Sincerely held religious beliefs do not expire or change from one year to the next.

162. Upon information and belief, Defendants' knew that granting a larger percentage of requests than those they denied, would appear valid in any future litigation.

163. Upon information and belief, the defendants had no uniform criteria for evaluating requests.

164. Upon information and belief, the defendants' did not establish a standardized set of procedures for each member of the Committee to follow.

165. Upon information and belief, the defendants' arbitrarily made determinations whether to grant or deny requests for religious exemptions.

166. Defendants evaluated requests for religious exemptions without knowing the applicant's identity.

167. Defendants could not determine applicants' veracity when they did not know who the applicants were.

168. Defendants' Process evaluated requests based on the unlawful standard of whether an articulated religious belief specifically prohibited the use of the COVID-19 vaccines.

169. Defendants' lent its power to the views of the Pope, instead of an applicants' sincerely held belief in following the Catechism of the Catholic Church.

170. Upon receiving numerous, valid, applications Defendant's added a supplemental form.

171. Applicants had to complete it.

172. Most grants or denials involved the use of the supplemental form.

173. The supplemental form was intended to shut down requests for exemptions based on (1) the belief of fetal cells being used in Vaccines; (2) beliefs of the body's connection to God and (3) beliefs that did not fit squarely within a religious dogma.

## NEXUS BETWEEN MANDATE AND VACCINES

174. The Mandate applied only to employees.

175. The Virus does not care about constitutional rights or societal issues like access to justice.

176. The Virus does not care about status.

177. The Virus infects humans indiscriminately.

178. The Virus does not stop at the courts' threshold.

179. The Virus does not differentiate between public or private spaces.

180. Any Plaintiff can serve as a juror or enter any courthouse as a member of the public.

181. A Plaintiff can enter any courthouse as a litigant or witness.

182. One, single person can infect everyone in a courthouse.

183. It could be a member of the public, a vaccinated employee, litigants, or any number of people entering and exiting courthouses across the state.

184. A Plaintiff can, and has, served as a juror in the same courthouse Plaintiff is forbidden from entering as an employee.

185. Plaintiffs admitted to practice law can enter any courthouse.

186. Defendants' required only their employees—who work in public courts—to be injected with Vaccines even though it does not prevent them from infecting others, or prevent others from infecting them.

CHANGING SCIENCE

187. The science is far from conclusive. At one point, the CDC backed its belief that masks are effective and Vaccines produce greater immunity than natural immunity. The CDC has since then acknowledged its original belief is inaccurate.

188. Scientific studies from institutions like Johns Hopkins University have shown that natural immunity may be superior to vaccine immunity.

189. The CDC has also acknowledged that Omicron is not deadly, even though more contagious than the Delta and the original strain of the virus. The CDC has acknowledged that Omicron has led to significantly less hospitalizations as well.

190. People who have not received a booster shot after six months do not retain the vaccine induced immunity.

191. Whatever immunity Vaccines currently provide, wane over time.

192. Defendants' disregarded that Plaintiffs' with natural immunity still have immunity.

193. Natural immunity is just as effective—if not more—than immunity achieved through vaccination; especially, against the variants like Delta and Omicron. Vaccines were intended to protect against the original strain. Vaccines do not provide protection against the current strain; which has mutated over fourteen times.

194. Infected individuals—whether vaccinated or not—transmit Virus to others.

195. No current Vaccine can prevent the transmission of the Virus.

DISTINGUISHING SIMILARLY SITUATED GROUPS

196. The Mandate requires employees to be up to date with their vaccinations.

197. Under the Mandate, an employee who has not received a booster shot within a year of the date of vaccination is not up to date (Unboosted).

198. The Unboosted are not considered to be vaccinated according to Defendants.

199. Yet, Unboosted employees are not subjected to weekly tests, daily Covid health assessments, or temperature checks.

200. Plaintiffs' whose exemption have been granted are required to test weekly, and are assessed daily.

201. Defendants' have not required Unboosted employees to get a booster shot either.

202. Infected, Unboosted employees could enter the court if they display no symptoms.

203. Upon information and belief, Defendants' have not taken any adverse action against Unboosted employees.

## ORANGE, GREEN, AND WHITE CARDS

204. On or about June 16, 2022, Defendants re-implemented a modified version of its July 2021, COVID-19 policies.

205. Employees with a valid, unexpired orange card on the outer most portion of their clothing may enter courts without masks.

206. Attorneys and agencies may also apply for a green attorney pass that allows them to enter courthouses unmasked. Attorneys must show proof of vaccination, or a booster shot within the last year. The green pass though is only sufficient for six-months or from the date of vaccination/booster. The public can enter courts mask free under the same circumstances.

207. Plaintiffs whose religious exemptions were granted still must wear a mask, get tested weekly, and submit to daily assessments.

208. But at the discretion of the presiding judge, those without an orange, green, or white card, can temporarily remove their masks in the courtroom if directed or actively speaking.

209. Paradoxically, if an attorney or member of the public got vaccinated in May 2021 and recovered from COVID-19 in May 2022, then that person must still wear a mask in court.

210. Defendants have quizzically invented and implemented COVID-19 policies that are at best arbitrary, and at worst recklessly discriminatory.

AS AND FOR A FIRST CAUSE OF ACTION
**VIOLATION OF THE  UNITED STATES CONSTITUTION
ARTICLE IV SECTION IV-GUARANTEE CLAUSE**

1.     Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

2.     The United States shall guarantee to every State in this Union a Republican

Form of Government.

3.     Defendants' represent the Judicial Branch in its administrative capacity.

4.     Defendants do not possess general police powers.

5.     Defendants Mandate is an exercise of police powers.

6.     Defendants Mandate exceeds the scope of power vested to it by NY Const. art VI.

7.     Defendants have no constitutional or statutory support to implement Mandate.

8.     N.Y. Const. art III §1 provides that the legislative power of the state shall be

vested in the senate and the assembly.

9.     The public is not required to get COVID-19 Vaccinations by any statute,

ordinance, or regulation.

10.    Plaintiffs are guaranteed  a republican form of government.

11.    The Mandate deprives Plaintiffs of a republican form of government.

12.    This cause of action is justiciable since it does not involve a "political question"

because it does not involve discretionary judgments made by elected officials or

conflict between political branches of government.

13.    Defendants are representatives of the non-political branch of government.

14.   Defendants Mandate creates a judicial monarchy that is forbidden in a democratic republic.

15.   Defendant Chief Judge DiFiore implemented the Mandate without consulting with the administrative board.

16.   Defendant Chief Judge DiFiore is required to consult with the administrative board pursuant to N.Y. Const. art VI §28 , and New York State Judiciary Law § 211.

17.   Defendants are without authority to require Mandate.

18.   Administrative edicts from the Judicial Branch of government are repugnant to a democratic republic.


                    AS AND FOR A SECOND CAUSE OF ACTION
                    **VIOLATION OF  N.Y. CONST. ART III § 1**

19.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

20.   N.Y. Const. art III §1 provides that the legislative power of the state shall be vested in the senate and the assembly.

21.   COVID-19 is a worldwide problem. It is not specific to courts.

22.   Plaintiffs cannot undo a Vaccine at the end of the workday.

23.   Plaintiffs face the same danger in their workplace as anywhere else people generally gather.

24.   Plaintiffs are not required to be vaccinated everywhere else people gather because the Legislature has not required the public to get vaccinated.

25. Defendant OCA has implemented a public health measure for employees, that is not paralleled in New York State.

26. Defendants Mandate exceeds the scope of power vested to it by NY Const. art VI.

27. Defendant OCA has created a Mandate that reflects the policy and beliefs of appointed administrators, who have no legislative authority to promulgate the Mandate.

28. In promulgating the Mandate Defendant OCA has violated the separation of powers doctrine; especially, in light of recent Supreme Court decisions.

29. The Legislature, and the Legislature only, may consider—if at all—whether the people whom they represent must get vaccinated.

## AS AND FOR A THIRD CAUSE OF ACTION
## VIOLATION OF SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT PURSUANT TO
## 42 U.S.C. § 1983

30. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

31. 42 U.S.C. §1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

32.   Defendants conduct occurred in their capacity as members of the Judicial Branch of government.

33.   Defendants were acting under color of law at all times alleged herein.

34.   Plaintiffs are United States citizens.

35.   Under the Fourteenth Amendment, "[n]o State shall . . .deprive any person of life, liberty, or property, without due process of law."

36.   Plaintiffs have a fundamental right to control their cellular biology as it constitutes life and property. Specifically, ribosomes which make the building blocks of life.

37.   There can be no doubt that the cells responsible for creating life within the human body are no different than life itself.

38.   These cells live within Petitioners' bodies. There can also be no doubt that Petitioners' have an absolute property right over the composition of their molecular biology. Just as Plaintiffs own their organs and appendages.

39.   Vaccines—objectively—use mRNA to cause  the human ribosome to read and translate its instructions to produce spike proteins.

40.   Plaintiffs have an absolute right to refuse the Judicial Branch of government's administrative arm from altering or artificially modifying their cellular biology to produce spike proteins, without due process of law.

41.   Plaintiffs have a property interest in continued employment through collective bargaining agreements.

42.    Defendants put Plaintiffs on an unconstitutional see-saw. The Mandate coerced Plaintiffs to choose between several constitutionally secured rights.

43.    If Plaintiffs' avoided the deprivation of their right to continued employment, then they could not avoid the deprivation of their life, and property interests.

44.    Plaintiffs who refused to allow Defendants to deprive them of their life and property interest, were automatically deprived of their property interest in continued employment.

45.    Plaintiffs who received a Vaccination were proximately harmed by Defendants' coercion to deprive them of their property interest in continued employment without due process.

46.    Plaintiffs who were terminated, were proximately harmed by Defendants' deprivation of their life, and property interests as well as their property interest in continued employment.

47.    Defendants proximately caused Plaintiffs injury.

## AS AND FOR A FOURTH CAUSE OF ACTION
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1985(3)

48.    Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

49.    42 U.S.C. §1985 states in pertinent part that "[i]f two or more persons in any State or Territory conspire . . .for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is . .

.deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

50.   Upon information and belief, on or about, and in between August 1, 2021, and April 7, 2022, Defendants Chief Administrative Judge Marks, Chief of Administration Justin Barry, and Chief of Operations Nancy Barry, entered into an agreement about implementing the religious exemption review process.

51.   Upon information and belief, said Defendants agreed to implement a process that granted and denied a pre-determined percentage of applications for religious exemptions; irrespective of the validity of applicants' sincerely held religious beliefs.

52.   Said defendants possess a wealth of legal knowledge and have numerous resources at their disposal. They had the tools to and experience to create a religious exemption process that appeared legal.

53.   Said Defendants overtly acted in furtherance of the conspiracy by creating religious exemption forms—including a supplemental form—distributing the forms to Plaintiffs, requiring Plaintiffs complete the forms, and deciding whether to grant or deny applications.

54.   Upon information and belief, said Defendants designed the supplemental form to make it more difficult for Plaintiffs' to obtain religious exemptions.

55. The supplemental form did not gauge whether religious beliefs were sincerely held, but rather contained declarations refuting Plaintiffs basis for their religious belief.

56. The supplemental form appeared to be provided to applicants, such as Plaintiffs, because of the applicants specific response.

57. However, Said Defendants provided the supplemental form to a vast majority of applicants regardless of their responses.

58. The forms second paragraph states "you have sought a religious based exemption from the USC COVID-19 vaccine mandate. Upon review of your submission, additional information is necessary to complete the review of your request."

59. Most Plaintiffs were required to complete the supplemental forms. The form next contains several bullet-points which state in sum and substance that applicants who had indicated concerns about abortion and/or fetal line cells were required to complete section A.

60. Anyone who indicated that they objected to a Vaccine "because [they] abstain[ed] from medicines or vaccines in general due to [their] religious faith" had to complete section B.

61. Plaintiffs' religiously professed beliefs mostly are not so black and white. There are a myriad of other reasons Defendant's ignored. Defendants' chosen concerns were easy to compartmentalize and attack.

62.    Defendants swallowed up the whole of Plaintiffs' who merely indicted a concern. Even a few sentences indicting a concern, is not sufficient for Defendants' to require its completion. Thus, Defendants' took minor concerns in the applications and made them the dispositive factors.

63.    The first paragraph of section A states in pertinent part and in sum and substance that the information presents the "current medical and scientific information regarding the COVID-19 vaccines and their development."

64.    It follows with a reminder of how important getting vaccinated is to everyone else.

65.    The following bullet-points set forth facts alleged to discredit the use of fetal cells in the production of Vaccines. Thereby discrediting, any basis to object based on such grounds. They are not supported or cited by any authorities.

66.    The supplemental form underlines that "While fetal cell lines were used to develop or manufacture these COVID-19 vaccines <u>no aborted fetal cells are in the vaccines themselves</u>" and "HEK-293 and PER.C6 cell lines <u>does not necessitate or create demand for future abortions.</u>"

67.    The form acknowledged that these fetal cells were derived from aborted fetus' from 1973 and 1985.

68.    Then the form ends with "<u>*Even after reviewing all of the facts above*</u>. *I swear or affirm that taking <u>any</u> of the COVID-19 vaccines would violate my sincere religious beliefs due to their connection to fetal cell lines in either testing or production.*" (underline added).

69. The supplemental form acknowledges though that the Vaccines were derived from aborted fetal cells.

70. Defendants ignored the multitude of factors in which religious exemptions could be based. Defendants instead narrowed all objections to the Vaccines to the underlined text above.

71. The next page lists all over the counter drugs like Ex-Lax, Stool Softener and Tums that contain HEK-293 Cell Line and requires the applicant to indicate whether he or she has ever used any of the products, if they had used them in the past two years, and whether they would use any of the products in the future if recommended by a physician.

72. Defendants' interrogation used unlawful criteria and boxed every applicant into a corner. It is inconsistent with common experience that someone requiring Tums would check to see if it was made with HEK-293, or even know what HEK-293 is.

73. The form transitions to section B. The questions in section B are set up for the applicant to create unreasonable contradictions. Then the form ends with broad questions asking about prior medicines, food and medical treatments or vaccines that the applicant abstains from because of his or her religious beliefs.

74. Section B does not include or indicate—as section A does—that it is not mandatory unless the applicant indicated that his or her religion involves abstaining from medicines and vaccines.

75.     It appears that section B must be completed irrespective of the applicant's basis for objecting; as though it is part of the supplemental form, rather than a separate, independent section.

76.     The questions are leading, and intended to produce inconsistent responses.

77.     Upon information and belief, said Defendants conspired to deprive Plaintiffs of the right to free exercise of religion under the First Amendment.

78.     Upon information and belief, said Defendants created and enacted the exemption process to deprive Plaintiffs of the protection of free exercise of religion pursuant to NY Const. art I §3.

79.     The exemption committee relied on invalid standards such as denying applications because opinions of religious leaders was given greater credence over dogma.

80.     Certain Christian and Jewish Plaintiffs requests for  religious exemptions were specifically denied and burdened.

AS AND FOR A FIFTH CAUSE OF ACTION<br><b>BREACH OF CONTRACT</b>

81.     Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

82.     Defendants unilaterally mandated its vaccination requirement as a condition of employment in contravention of the contract's express terms prohibiting Defendants from making any unilateral mandates.

83.     The contract did not contain a clause requiring Vaccination as a condition of employment.

84. Defendants and Plaintiffs agreed that the terms of their contract control if in conflict with any rules of the Chief Judge or Chief Administrative Judge.

85. Defendants broke its covenant by giving credence to the Mandate over the absence of such a term on the contract.

86. Defendants' further agreed to provide Plaintiffs' with procedural due process rights prior to taking disciplinary action. Defendants did not comply with the bargained for procedure, and terminated Plaintiffs without notice, a hearing, or any of the other procedures set forth in the contract.

87. Defendants terminated Plaintiffs without a finding that they were incompetent or engaged in misconduct.

## AS AND FOR A SIXTH CAUSE OF ACTION
**VIOLATION OF PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT PURSUANT TO**
42 U.S.C. § 1983

88. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

89. Plaintiffs are ensured the benefit of employment through collective bargaining agreements.

90. Plaintiffs have a property right in continued employment.

91. Defendants deprived Plaintiffs of their property interest in continued employment by terminating said Plaintiffs without due process of law.

92. Defendants did not even provide the minimal process required such as notice and hearing.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## VIOLATION OF N.Y CONST. ART I § 6 AND THE
## DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
## ARBITRARY AND CAPRICIOUS

93.    Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

94.    Defendants Mandate arbitrarily requires Plaintiffs to be vaccinated even though

they do not protect Plaintiffs from becoming infected nor do they prevent

Plaintiffs from infecting others.

95.    Defendants Mandate permits unvaccinated, and potentially infected members of

the public to enter the courts, but prohibits unvaccinated, likely healthy,

Plaintiffs from entering the courthouse.

96.    Defendants Mandate applies to the Plaintiffs who have natural immunity.

97.    Defendants Mandate allows Unboosted—and therefore unvaccinated—

employees to remain employed in the courts while excluding Plaintiffs.

98.    Plaintiffs with natural immunity are not allowed to enter UCS facilities while

Unboosted employees with no immunity are not prohibited from entering as

employees.

99.    Defendants Mandate cannot stop the virus from spreading by requiring only

employees to get vaccinated.

100.   Defendants Mandate cannot stop the spread of the virus even if everyone in the

court is vaccinated.

101.   The Vaccines are not effective against the variants of Virus.

102. Defendants' Mandate prevents Plaintiffs from entering their respective courthouses as employees but not as a member of the public.

103. The risk of spreading the virus does not lessen based on Plaintiff's status.

104. The risk of spreading the virus is the same whether a human being is an employee, juror, litigant, attorney, witness, or any other person.

105. Defendants Mandate does not prevent the public from congregating in courts.

106. Vaccines are not safe and effective, and present adverse side effects.

107. Defendants Mandate blindly put Plaintiffs in a position to be harmed.

108. Defendants Mandate forced Plaintiffs to choose their health over their livelihoods.

109. All Plaintiffs have suffered emotional distress, including anxiety, depression, sadness, fear, and pain and suffering.

110. Defendants Mandate have caused terminated Plaintiffs and early retirement Plaintiffs to suffer economic losses as well.

AS AND FOR AN EIGHTH CAUSE OF ACTION
**VIOLATION OF THE EQUAL PROTECTION CLAUSE UNDER**
**THE FOURTEENTH AMENDMENT PURSUANT TO**
<u>42 U.S.C. §1983</u>

<u>COUNT 1</u>

111. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

112. The Fourteenth Amendment, Section 1 states in pertinent part that "[n]o State shall make or enforce any law . . . nor deny to any person within its jurisdiction the equal protection of the laws."

113.   Plaintiffs are similarly situated—per the UCS Mandate—to UCS employees with expired vaccinations.

114.   UCS classifies employees whose vaccinations expired as unvaccinated.

115.   UCS though, permits these employees to continue employment in their respective courts.

116.   Plaintiffs who are considered unvaccinated—and have not been granted a religious exemption—were terminated by the UCS and prohibited from reporting to the courts where they worked.

117.   Plaintiffs who are still employed under a religious exemption are required to test weekly and report status updates daily.

118.   Employees with expired vaccinations do not have to test.

119.   Employees with expired vaccinations do not have to quarantine if exposed to COVID-19 if they are asymptomatic.

120.   Said Plaintiffs must quarantine for several days.

121.   Respondents distinction between Plaintiffs and said employees is arbitrary and bears no rational relationship to the ends of protecting the public health.

## COUNT 2

122.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

123.   Highly infectious diseases spread wherever people gather.

124.   Vaccines do not prevent the transmission of the Virus causing COVID-19.

125.   Booster shots do not prevent transmission of the Virus.

126. Defendants' Mandate does not apply to anyone else who enters courthouses.

127. Plaintiffs are similarly situated with other individuals in the courthouse as they are all human beings who are equally susceptible to transmission and infection of the Virus; irrespective of whether the public can enter private areas or not.

128. Respondents distinction between Plaintiffs and the public is arbitrary and bears no rational relationship to the ends of protecting the public health.

## COUNT 3

129. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

130. Defendants Mandate creates a classification based on the perception of viral immunity. Defendants' perceive vaccinated employees to have immunity against the Virus. Whereas Defendants perceive Plaintiffs to lack immunity.

131. Defendants' distinction creates a classification based on the perception of Plaintiffs' immune systems.

132. Plaintiffs are unable to change the condition of their immune systems since Vaccines do not prevent transmission and certain Plaintiffs previously infected are already immune.

133. Defendants' classification targets Plaintiffs based on the perceived  genetic characteristics of their immune systems.

134. The classification is suspect.

135. Defendants have absolutely no compelling governmental interest in stopping the spread of COVID-19.

136.   Requiring Plaintiffs to follow the Mandate is not necessary.

137.   Defendants have proximately caused Plaintiffs harm as described further below.

REQUESTS FOR RELIEF

138.   Under the First Cause of Action Plaintiffs seek:

     i.   A declaration adjudging the Defendants exceeded the scope of their Constitutionally delegated power.

     ii.   A declaration adjudging that the Defendants had no power or authority to require the Mandate.

     iii.   A declaration adjudging that the Mandate to be unconstitutional, unlawful, and invalid.

139.   Under the Second Cause of Action Plaintiffs seek:

     i.   Declaratory judgment that the Mandate is not constitutionally or statutorily authorized.

     ii.   The Mandate violates the State's separation of powers doctrine.

140.   Under the Third Cause of Action Plaintiffs seek:

     i.   Monetary damages in an amount to be determined after trial.

     ii.   Attorneys costs and fees.

141.   Under the Fourth Cause of Action Plaintiffs seek:

     i.   Compensatory damages.

     ii.   Punitive damages.

     iii.   Attorneys costs and fees.

142.   Under the Fifth Cause of Action Plaintiffs seek:

    i. Retired Plaintiffs seek the full benefits and compensation they would have received if Defendants had not caused them to retire early; including, time they were forced to use prior to retirement and accrual time.

    ii. Retired Plaintiffs seek expectation damages for the benefits they would receive if Defendants had not caused them to retire early.

    iii. Terminated Plaintiffs request full back pay, compensation for time lost and time used prior to termination, the option to continue employment in the same capacity prior to the Mandate and testing requirement, and monetary damages.

    iv. Plaintiffs working under a religious exemption request the ability to continue employment in the same capacity prior to the Mandate and testing requirement.

143. Under the Sixth Cause of Action Plaintiffs seek:

    i. Declaration that the Mandate is null and void since it was procured by depriving Plaintiffs of due process of law.

144. Under the Seventh Cause of Action Plaintiffs seek:

    i. Monetary damages in an amount to be determined after trial.

    ii. Attorneys costs and fees.

145. Under the Eighth Cause of Action; including, each count Plaintiffs seek:

    i. Declaration that Defendants violated the equal protection clause.

    ii. Monetary damages in an amount to be determined after trial

      iii.  Attorneys costs and fees.

## CERTIFICATION & CLOSING

146.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of

my knowledge, information, and belief that this complaint: (1) is not being presented

for an improper purpose, such as to harass, cause unnecessary delay, or needlessly

increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous

argument for extending, modifying, or reversing existing law; (3) the factual

contentions have evidentiary support or, if specifically so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or

discovery; and (4) the complaint otherwise complies with the requirements of Rule

11.

Dated:    July 7, 2022
            Uniondale, NY

                        Respectfully Submitted,

                        LAW OFFICE OF CHAD J. LAVEGLIA
                        CHAD J. LAVEGLIA ESQ.,
                        *Attorneys for Plaintiffs*
                        626 RxR Plaza, Suite #613
                        Uniondale, NY 11556
                        (631) 450-2468
                        claveglia@cjLLaw.org